M. LAZARUS SEIGLE and SARAH SEIGLE, Appellants, v. FIRST NATIONAL Co., a Corporation; FIRST NATIONAL BANK in St. Louis, Trustee, and HENRY S. CAULFIELD, Cotrustee.

M. LAZARUS SEIGLE and CECELIA SEIGLE, Appellants, v. FIRST NATIONAL Co., a Corporation; FIRST NATIONAL BANK in St. Louis, Trustee, and HENRY S. CAULFIELD, Cotrustee.

M. HERMAN and R. SIDNEY HERMAN, Trustees for MARCUS HERMAN, Appellants, v. FIRST NATIONAL Co., a Corporation; FIRST NATIONAL BANK in St. Louis, Trustee, and HENRY S. CAULFIELD, Cotrustee.

HALLIE HERMAN and M. HERMAN, Appellants, v. FIRST NATIONAL Co., a Corporation; FIRST NATIONAL BANK in St. Louis, Trustee, and HENRY S. CAULFIELD, Cotrustee.

CLARA SCHNEPF and NEW ERA SHIRT COMPANY, a Corporation, Appellants, v. FIRST NATIONAL Co., a Corporation; FIRST NATIONAL BANK in St. Louis, Trustee, and HENRY S. CAULFIELD, Cotrustee. —90 S. W. (2d) 776.

Court en Banc, February 7, 1936.

*Hyman G. Stein* for M. Lazarus, Sarah and Cecelia Seigle; *Samuel I. Sievers* for M. Herman, R. Sidney Herman and Hallie Herman; *Greensfelder & Grand* for Clara Schnepf and New Era Shirt Company.

*Bryan, Williams, Cave & McPheeters* for First National Company.

422

*Kenneth Teasdale, Robert Burnett* and *Wm. R. Gilbert* for First National Bank and Henry S. Caulfield, Trustees.

*Lashly, Lashly & Miller* for The Participation Holders Advisory Committee.

*Wm. M. Fitch* and *Stanton E. Boudreau, amici curiae.*

424

COLLET, J.—Appeal from the order and judgment of the Circuit Court of the City of St. Louis directing the trustees of the First National Company to pledge the assets of that company to secure a loan from the Reconstruction Finance Corporation to the First National Company, and extending the date of maturity of certain obligations of the First National Company.

On January 3, 1922, the First National Company, hereafter referred to as the "company," entered into an agreement with the First National Bank in St. Louis, hereafter designated as the "bank" under the terms of which agreement (referred to hereafter as the "trust agreement") the bank was to act as trustee and to hold first mortgage securities owned by the company in trust to secure participation certificates issued, and to be issued and sold by the company. The participation certificates were issued in various principal amounts. These certificates represented an interest in the securities deposited in the trust fund with the bank, the amount of the holder's interest being fixed by the principal amount of the certificates. The company agreed to pay interest on the certificates and on the maturity date thereof to repurchase them from the holder for the face amount. The agreement between the company and the bank further provided that securities should be deposited in the trust fund with the bank of the face value equal to the principal amount of all outstanding participation certificates. The right was given the company to substitute the securities with the trustee bank provided that the total amount of the securities in the trust fund should at least equal the total amount of the outstanding participation certificates. The trust

agreement provided further that in the event of a default in the payment of interest on the participation certificates, or the principal thereof when such certificates or any of them came due, the bank was authorized and directed to sell such part of the securities held by it as might be necessary to discharge the default or at the election of the bank after notice of its intention so to do, to sell all securities in the trust fund and divide the proceeds *pro rata* among all of the participation certificate holders.

On May 1, 1933, the trust fund consisted of securities of the face value of $9,683,844.77, of which total amount approximately one-half were in default. On that date the company announced that it could no longer meet its obligations to the participation certificate holders and announced the creation of a bondholders' committee, formed for the expressed purpose of protecting the certificate holders' rights. On May 3, 1933, a suit was filed in the Circuit Court of the City of St. Louis asking for the appointment of a receiver and for an injunction to prevent the dissipation of the securities held in the trust fund. Other similar suits followed in rapid succession, five having been filed up to and including May 8, 1933. Summarized these actions requested the removal of the bank as trustee, the appointment of a new trustee or a receiver, the liquidation of the securities held in the trust fund and the distribution of the proceeds of those securities to the participation certificate holders. In some of these suits it was alleged that the company was an affiliate of the bank, was under the control of and owned by the stockholders of the bank and that the bank had not faithfully represented the certificate holders in the management of the trust fund resulting in loss to the certificate holders. An accounting of the transactions between the trustee bank and the company was asked. All of these actions were consolidated with the suit brought by Kate Ellis. The bank filed separate answers in the nature of general denials to all these petitions. On July 24, 1933, the bank filed a cross-petition in the consolidated case alleging, among other things, that the company was unable to pay interest on the participation certificates or to purchase those certificates as they came due; that the company had solicited the participation certificate holders to extend the time for the repurchase of the certificates and to intrust their interests to a committee; that in order to obtain the best results in liquidating the assets of the trust estate, certain securities should be extended, some foreclosed, others reorganized, and in some instances conveyance of properties be accepted in satisfaction of securities; that since the petitions in several of the suits contained allegations implying that the bank might not handle the securities to the best advantage of the participation holders, the bank requested that a cotrustee be appointed; that the trustees be authorized and directed to realize on the securities constituting the trust fund, the court retaining juris-

diction of the cause for the making of such further orders with respect to the administration of the trust and the handling and realization of the securities and distribution of the proceeds thereof as might be proper.

On that day the consolidated cause was heard and a decree entered. By this decree the court found that the plaintiffs and defendants in the several causes (which had been consolidated) sufficiently represented as a class the holders of certificates of participation in the funds and securities in the possession of the bank so as to enable the court to adjudge all rights of said participation holders as a class, whether adjudged in that decree or thereafter submitted to the court by the trustee and cotrustee. It found that the securities held by the bank in the trust agreement were held in trust for the benefit of participation holders until all participation certificates had been discharged, any balance remaining thereafter being for the use and benefit of the company. The court appointed a cotrustee and directed that the trustees proceed with the liquidation of the assets in the trust fund. No objection was made by any of the parties to this decree. Subsequent to the date thereof the trustees, under the direction of the court, on two occasions made distribution of two per cent dividends to all participation certificate holders.

On January 18, 1935, the company filed what is referred to as an intervening petition in which the company reported to the court that it had negotiated an agreement with the Reconstruction Finance Corporation for a loan to the company of approximately $4,400,000 for the purpose of distributing to the certificate holders a dividend of approximately forty-six per cent of the face value of the certificates, but that in order to complete the loan it would be necessary to pledge all of the assets of the company held by the bank as trustee (except a small amount of cash) to the Reconstruction Finance Corporation as security for that loan and to place the complete control of liquidation of those securities in the Reconstruction Finance Corporation for the period of the loan which was to be fixed at three years. A written commitment setting out the terms of the proposed loan agreement was presented to the court. The intervening petition further asked that the maturity dates of all participation certificates be extended to 1942 and that the interest rate thereon be reduced to three per cent. Numerous objections were filed to this intervening petition. Notices were mailed to all participation certificate holders by the company advising them of the negotiations with the Reconstruction Finance Corporation and requesting that all certificate holders approving the proposed loan indicate their approval in writing addressed to the company. The court set the intervening petition and the objections thereto for hearing on May 2, 1935. The company notified all participation certificate holders of that hearing by registered letter. At this hearing evidence was

offered which disclosed that the appraised value of the properties securing the first mortgage securities which comprised the trust fund was $17,295,244. This appraisal was made by appraisers selected by representatives of the Reconstruction Finance Corporation from a list of names furnished by Mr. Farris, President of the First National Company. The appraisal was accepted by the Reconstruction Finance Corporation. The agent of the Reconstruction Finance Corporation handling the appraisal testified that the market value of the securities representing the trust fund as of June, 1934, at a forced sale was $6,579,620. The face value of the outstanding participation certificates as above stated was $9,683,844.77. The loan was to bear four per cent interest. The annual interest requirement would therefore be approximately $176,000. The income arising from interest collections on the securities in the trust fund and the income from real estate which had been foreclosed was, for the last six months of 1933, $84,287.76. For the year 1934 the income from the same source was $198,034.85. The president of the company estimated that this income for the year 1935 would amount to $291,520. These figures do not include any receipts from the payment of principal on the securities.

At the time of the hearing on May 2, 1935, 2,958 of the 3,340 participation certificate ,holders, representing 87 21/100 per cent of all the outstanding certificates, had indicated their approval of the proposed plan. The certificate holders appearing and objecting to the plan represented approximately one-half of one per cent of the total outstanding certificates. The remaining certificate holders neither replied to the company's inquiry nor appeared at the hearing. The proposal or commitment of the Reconstruction Finance Corporation required that the holders of not less than 95 per cent in amount of the outstanding participation certificates consent to the pledge of the assets of the company as a condition precedent to the making of the loan.

After the hearing the court, by its decree, found that the proposal was fair to all the participation certificate holders and that the returns then accruing and to accrue from the assets in the hands of the trustees were and would be more than sufficient to meet the interest requirements on the proposed loan. The trustees were authorized and directed to enter into a written agreement with the Reconstruction Finance Corporation pledging all of the assets of the company in the hands of the trustees to secure the loan which was to be made to the First National Company. It provided that the proceeds derived from the loan should be paid to the First National Bank in trust to be distributed by the bank to the participation certificate holders *pro rata*. The decree further provided that the Reconstruction Finance Corporation should have complete management and control of the pledged assets for the purpose of liquidating the

securities, the collection of interest thereon and gave to the pledgee the right to handle the pledged securities in substantially the same manner as the trustee bank was originally authorized under the trust agreement and as the cotrustees were under the decree of July 24, 1933. All of the interest received from the pledged securities and rentals from foreclosed real estate were to be applied: First, to the payment of interest on the loan. Second, for meeting the necessary expenses of the trustees, except the expenses of the First National Bank in servicing and liquidating the pledged securities. Third, fifty per cent of any remaining excess income from interest and rentals or so much thereof as the Reconstruction Finance Corporation desired should be used for retiring the loan. Fourth, the remainder of such income, after setting aside a proper reserve for rehabilitation, maintenance and operation of the properties securing the loan, was to be used for payment of participation certificates under the order of the court and with the approval of the Reconstruction Finance Corporation. The decree further provided that when the collections on account of the principal and .from the sale of principal assets should have been applied to the retirement of the loan to the extent that the loan had been retired at least fifty per cent, then twenty-five per cent of the collections from principal assets and the sale of such assets might be deposited in a fund for the purpose of distribution to certificate holders. The decree further provided for the creation of a revolving fund of $150,000 for the protection of the loan including, but not limited to, the payment of taxes and rehabilitation of the physical properties. The decree provided that after the repayment of the loan all of the pledged assets should be returned to the trustees to be further administered by the order of the court; that the First National Bank should service and liquidate the pledged collateral at the request of the Reconstruction Finance Corporation without charge; that the proceeds of the loan should be disbursed by the First National Bank, together with all sums which had been realized by the trustees on the principal of the pledged assets from June 30, 1934 (the date of the last two per cent dividend) by check to the holders of outstanding participations. These checks were to bear an indorsement by the terms of which the payee would assign to the Reconstruction Finance Corporation the interest of the payee in the pledged assets until such time as the loan should be paid in full. The decree further provided that the maturity of all outstanding participation certificates be extended to January 1, 1940. It did not reduce the interest rate on these certificates. The court expressly retained jurisdiction to make any and all orders necessary to carrying out the plan of the decree; required the trustees to continue to make semi-annual reports to the court and expressly stated that the decree was not to be regarded as deciding matters, the decision of which was theretofore reserved

or were not specifically adjudicated therein. Separate motions for new trials were filed by each of the plaintiffs. All were overruled. Appeals were requested and denied whereupon appellants applied to this court for mandamus to compel the granting of the appeal. Our alternative writ was issued. Thereafter the parties filed in this court a stipulation to the general effect that our peremptory writ should be issued. Our peremptory writ issued and the appeals were allowed.

The numerous assignments of error may be consolidated into three general propositions: First, that the court was without power or authority to modify or amend and in effect to nullify its decree of July 24, 1933. Second, that the court exceeded its power in directing that the securities constituting the trust fund be pledged to secure a loan when, under the terms of the trust agreement, in the event of a default those securities were to be sold and the proceeds of the sale distributed to the participation certificate holders. Third, that the court had no power nor right to extend the maturity date of the participation certificates. These points will be considered in the order stated.

I. In the decree of July 24, 1933, is found the following language: "This Court retains and reserves full jurisdiction to determine and adjudicate all of the other issues which have or may arise and not adjudicated by the express provisions of this decree. The right is reserved to the parties hereto to apply from time to time for any further or other orders and directions to the Trustee and Co-Trustee; and this Court reserves the right and jurisdiction to make from time to time such orders amplifying, extending or otherwise modifying this decree as to the powers, duties, and authority of the Trustee and Co-Trustee as may at any time seem proper, and for the purpose, on like application, of adjudicating and determining the respective and reciprocal rights of participation holders, and for the purpose, on like application, of making such orders and decrees from time to time as may be necessary and proper concerning the administration of the trust, the realization of the securities, and the disbursement and distribution of the proceeds thereof."

By this language it is evident that the trial court undertook to retain jurisdiction of the cause for the purpose of making any modifications which might appear advisable touching the duties, powers or authority of the trustees. Appellants insist that the purpose of the trial court in this respect could not be carried out because of a lack of authority vested in that court to modify its previous decree. It is undoubtedly true as a general proposition that a final judgment may not be modified at a subsequent term altering substantive rights fixed by the final judgment previously entered except as expressly authorized by statute.

In State v. Mulloy, 322 Mo. 281, 15 S. W. (2d) 809, this court held that a judgment determining and defining the rights, liens and priorities of lien claimants to certain real estate, directing that the real estate be sold by the sheriff of the county, and appointing a receiver to remain in charge of the property for the purpose of managing, controlling, conserving and preserving it to the end that the property be protected for the rightful recipients until such time as the liens and other charges were fully satisfied and discharged or until the property was sold when the receiver should deliver possession to the purchaser, make his final report and be discharged, was a final judgment and could not at a subsequent term be, in effect, set aside by the entry of a new judgment which changed the rights of the parties and the person who should conduct the sale. It was held that the original decree purported to settle and determine all the rights of the parties and left none of those rights to be thereafter adjudicated or reviewed by the court and hence was a final judgment which could not be amended, modified, set aside, or vacated after the term. The power of a court in equity to retain jurisdiction for the proper administration of a trust estate was not discussed in that case, it merely being held that the decree was final in form and effect. In the case at bar the decree of July 24, 1933, is entirely different. It contemplates the necessity for future alterations in the powers and duties of the trustee and expressly reserves the right to the parties to apply from time to time for modifications and further directions to the trustees. The necessity for the existence of such authority in the courts administering trust estates is illustrated by the case before us. The record discloses that in the period of time from July 24, 1933, to May 2, 1935, the trustees, concededly diligent in the exercise of their duties and responsibilities, had succeeded in realizing sufficient funds from the liquidation of the securities comprising the trust estate to pay only two two per cent dividends. It is therefore evident that the assets were comparatively unsalable. If the court in its decree of July 24, 1933, had directed the trustees to immediately sell the assets at public sale and the trustees had proceeded to carry out that direction with the result that a negligible or nominal sum was realized from the sale and the court had on the report of the trustees disclosing such fact refused to approve such a sale and had modified its judgment calling for an immediate sale, could it be said that the trial court exceeded its powers by obviously undertaking to properly preserve the estate? We think not. In cases like the one before us it is frequently necessary for the court to retain jurisdiction of a cause for a considerable length of time, modifying its orders relating to the administration of the trust estate as changing conditions warrant and compel. A lack of such power would frequently result in the failure of the accomplishment of the object for which the court's juris-

diction was invoked. The decree of July 24, 1933, was not final in the sense that it precluded the future modification of the administrative orders contained therein.

■ II. The decree of May 2, 1935, was therefore valid unless the court was without power to vary the terms of the trust agreement or unless the decree, as amended, was inequitable. A number of authorities are cited on the question of the court's power to vary the terms of the trust agreement. We think the proper rule is announced by the Court of Chancery of New Jersey in the case of National Bank and Trust Co. v. Lincoln Mortgage & Title Guaranty Co., 148 Atl. 713, l. c. 715:

"Nor is there doubt as to the power of the court in the premises. It is of course quite true that ordinarily the trustee is bound, in the administration of the trust, by the terms of the trust, and that even this court has no right to authorize the trustee to depart therefrom; but it is also true that a court of equity, in its capacity as universal trustee, may in cases of emergency, for the preservation of the trust estate and the protection of the *cestuis,* authorize and direct the trustees to do acts which under the terms of the trust and under ordinary circumstances they would have no power to do. This power resides in the Court of Chancery as a part of its original inherent jurisdiction—its general administrative jurisdiction in cases of trusts."

This rule is reasserted by the Supreme Court of Errors of Connecticut in the case of Hoffman v. First Bond & Mortgage Co. of Hartford, 164 Atl. l. c. 658, as follows:

"In an emergency a court of equity may, for the preservation of the trust and the protection of the beneficiaries from loss, even authorize a trustee to depart from the terms of the trust agreement."

To the same effect are In re New, L. R. (1901), 2 Ch. Div. 955, and 2 Perry on Trusts (7 Ed.), section 764. The following cases cited by appellants are not in point because they deal with the right of a trustee to vary from the specific directions contained in the instrument creating the trust. [Loud v. Union Trust Co., 313 Mo. 552, 281 S. W. 744; First National Bank v. National Broadway Bank, 156 N. Y. 459; Tuttle v. First National Bank of Greenfield, 187 Mass. 533; Price v. Courtney, 87 Mo. 387.] The distinction between those cases and the case at bar lies in the fact that in the case before us the court's power to vary from the terms of the trust agreement in the management of a trust estate under the control of the court is involved, whereas in the above cases the power of the trustee to do so without an order of the court was the point at issue. Other cases cited by appellant are inapplicable for reasons which we will note.

In Kneeland v. American Loan Co., 136 U. S. 89, the court had before it the question of whether the rights of general creditors could be preferred to the rights of lien holders contrary to the pro-

visions of the instruments creating the liens. The court said, 1. c. 97:

"One holding a mortgage debt upon a railroad has the same right to demand and expect of the court respect for his vested and contracted *priority* as the holder of a mortgage on a farm or lot." (Italics ours.)

As stated theretofore in the same opinion:

"The receivership was at the instance of a judgment creditor, and was with a view of reaching the surplus earnings for the satisfaction of his debt. It was not at the instance of mortgagees, nor were they seeking foreclosure of their mortgages. They were asking nothing at the hands of the court. They were not asking it to take charge of the property, or thus impliedly consenting to its management of the property for their benefit."

In the case at bar there is no complaint that the court was unfairly or improperly preferring the claims of others to the claims of participation certificate holders. In the case cited the court did not hold that the trial court was without power to, by decree, make such a preference, but said:

"It is the exception, and not the rule, that such *priority of liens* can be displaced." (Italics ours.)

In Jamison v. McWhorter, 31 Atl. 517, the question before the Court of Errors and Appeals of Delaware was whether a court of equity could authorize the trustee to mortgage property devised in trust by will for the purpose of raising money for the maintenance and education of the testator's sons when the will did not confer any such authority upon the trustee. The majority opinion makes no mention of any question of emergency, neither was there any suggestion in that opinion that the mortgaging of the trust property was necessary as an incident to the administration of the trust or its preservation. That case is unlike the case at bar on the facts. However, we note that in a dissenting opinion HOUSTON, J., concludes, after reviewing evidence not referred to in the majority opinion, that a necessity for mortgaging the trust *estate existed* and that therefore the mortgage authorized by the Court of Chancery was valid.

In Drake v. Crane, 127 Mo. 85, 29 S. W. 990, this court had under consideration the power of a trustee to make a contribution to a realty company for the purpose of inducing the location of a hotel near a large tract of real estate belonging to the trust estate. The contribution was attempted to be made under authority of a provision of a will which provided that a fund amounting to twenty-five per cent of the net rents and profits arising from the trust estate should be placed in a reserve fund for the purpose of guarding against losses by shrinkage or other contingencies. The evidence showed that the construction of the hotel adjacent to the trust property would prevent further decline in the value of the trust prop-

erty. This court held that under this provision of the will power was conferred upon the trustees to make the subscriptions out of the reserve fund upon the ground that the contribution was necessary to guard against losses by shrinkage and other contingencies. In the course of the opinion the court said, l. c. 102:

"It may be conceded that a court of equity has no power to make a new will for a testator, and that the extent of its power is to construe the will as presented to it. And, further, that such court can no more authorize an act to be done which is in excess of the powers conferred by the will than can the trustees therein do such act. As to these propositions there is, or can be, no question or doubt."

The question involved in the case at bar was not involved in the Drake case. In the latter case the question before the court was whether the trustees were acting within the scope of the authority conferred upon them by the will. The question of whether a court in the liquidation of a trust estate in an emergency possessed the power to vary the terms of a trust arrangement made prior to and not in contemplation of the emergency and when the trust estate was not subject to the control of the court was not involved. The general language contained in the latter part of the above-quoted paragraph was much broader than the issues and was not necessary to the determination of that case because the court found that the authority to make the contribution was actually conferred by the language of the will. For those reasons we do not think the Drake case is controlling authority on the question before us.

In the case of Doe Run Lead Co. v. Maynard, 283 Mo. 646, 223 S. W. 600, this court en banc was considering the question of whether in a pretended dissolution of a corporation for the purpose of consolidating it with another corporation, stockholders of the corporation sought to be dissolved could be compelled to exchange their stock for stock in the consolidated corporation or compelled to sell it against their will. No question of insolvency or preservation of assets was involved, both corporations being going concerns. We do not think this case is authority on this point.

It is suggested by appellants that there was no showing of the insolvency of the company and hence the above rule cannot be applicable. The undisputed facts are that the company had defaulted in the payment of interest on the participation certificates at the time of the filing of the receivership actions by appellants. It is also conceded that the present market value of the securities constituting the trust fund is much less than the amount of the outstanding obligations against it. The rule stated is therefore applicable. We conclude that the court possessed the power to modify the terms of the trust agreement.

434

Was the decree fair and equitable to these appellants? We think it was. The First National Company had ceased to meet its obligations to the participation certificate holders. Certain of those certificate holders, these appellants, had seen fit to appeal to the court to take charge of the property and administer it to the end that their rights might be protected. This the court did and directed that the trustees designated by the court should proceed to liquidate the assets of the company. Following that direction the trustees, as above related, were able to realize in almost two years only enough to distribute two two per cent dividends to the certificate holders. It should be obvious that the sale of the assets for a proper amount was impossible. In effect, the decree of May 2, 1935, defers the date for the possible forced liquidation of these assets to the date when the Reconstruction Finance Corporation loan becomes due, three years hence. Assuming that the worst happens and conditions during those three years have not permitted the liquidation of sufficient of the assets to discharge the loan and a foreclosure results; then the assets must be sold if the pledgee so elects. But that contingency and that action is the thing which appellants insist the court should order done now. We fail to see how the decree is unfair in that particular.

It is argued that the court should not empower the Reconstruction Finance Corporation to liquidate these assets. But it is not suggested that this agency would not do so properly or as efficiently as possible or as could be desired. We are convinced that the trial court has treated these appellants fairly in approving this loan.

It is insisted by appellants that the action of the court in directing the pledging of the trust estate to secure this loan results in a taking of their private property for private use in violation of Section 20 of Article II of the Constitution of the State of Missouri and deprives appellants of their property without due process of law in violation of Section 30 of Article II of our Constitution, Section I of the Fourteenth Amendment and the Fifth Amendment to the Constitution of the United States; that the effect of the decree amounts to an impairment of the obligation of their contracts and is therefore in violation of Section 15 of Article II of the Missouri Constitution and Section 10 of Article I of the Constitution of the United States, and also operates as a denial to appellants of the equal protection of the laws contrary to the provision of Section 1 of the Fourteenth Amendment of the Constitution of the United States. No authorities are cited in support of any of these constitutional objections.

In the sense that the court in the administration of this trust estate has taken charge of the trust estate it might be said that there was a technical taking of the property. But that taking was at the request of the appellants. The decree specifically provides that

the proceeds of the loan must be distributed to the certificate holders. The proceeds of the liquidation of the assets is to be applied to the discharge of the loan and then to the discharge of the certificates. The decree carefully insures the application of the entire trust estate for the benefit of the certificate holders. And so if it could be said in an extreme technical sense that there was a taking of the appellant's property for private use, that use was to the use of these appellants and at their request.

The objection that the decree deprives appellants of their property without due process of law is equally untenable. The process complained of is the process invoked by these appellants and consists of the regular, usual and orderly administration of a trust estate by a court of equity. We will not say that such process contravenes the due process clause of the Missouri or Federal Constitutions. It seems rather strange that appellants, who invoked that process, should challenge its propriety.

Neither does the decree impair the obligation of appellant's contracts (the participation certificates). The provision of the trust agreement (which was incorporated by reference in the participation certificates) to the effect that the trustee should sell the securities constituting the trust fund upon the failure of the company to meet its obligations to the participation certificate holders, constituted a direction to the trustee as to the method of procedure to be followed in enforcing the obligation fixed by the certificate. The obligation of the contract between the certificate holders and the company in the final analysis consists of an agreement on the part of the company to pay interest on the certificates and the principal at maturity. Appellants invoked the authority of the court to enforce that obligation rather than depend on the trustee performing the duties imposed upon it by the trust agreement. The decree of the court does not disturb that obligation but seeks to enforce it in a manner which, to the court, appeared to be the most effective means.

Appellants do not indicate in what respect the decree denies to them the equal protection of the law. No grounds for such objection occur to us.

III. Appellants complain of the action of the court in extending the maturity date of the participation certificates. Several grounds are urged in support of this contention. Among them it is asserted that the question of the liability of the First National Bank for alleged misfeasance or malfeasance in the execution of its duties as trustee of the trust fund has not been determined and that should the maturity date of the participation certificates be extended until 1940 the Statute of Limitations might then be a bar to any action against the bank on this account. Counsel for respondent bank insist that the statute would not be pleaded as a defense. Be

436

that as it may, another and much more important consideration arises out of the fact that the court by extending the maturity date of the participation certificates to a definite date actually made a new contract between the parties. This, we think, the court was without authority to do. While the court had, as we have heretofore observed, ample power and cause to suspend the enforcement of the contract pending the administration of the trust estate by the court, yet it is the generally accepted rule that a court does not have the right or power to make new contracts between parties over the objection of either. [Doe Run Lead Co. v. Maynard, 283 Mo. 646, 223 S. W. 600; Drake v. Crane, 127 Mo. 85, 29 S. W. 990; Danzer v. Moerschel (Mo.), 214 S. W. 849; Ellis v. Treat, 236 Fed. 120.] It should not, however, be necessary to reverse this case for that reason since the judgment may be modified and the cause remanded with directions to that effect.

The judgment of the trial court is therefore affirmed in all respects except as stated in the last preceding paragraph. For the reasons stated in that paragraph the cause is remanded with directions to the trial court to modify its decree in accordance therewith. All concur.